# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31003

United States Court of Appeals
Fifth Circuit

**FILED**
April 7, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

GIRAY BIYIKLIOGLU, also known as Johnny Bryan,

Defendant – Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CR-202

Before REAVLEY, JOLLY, and ELROD, Circuit Judges.

PER CURIAM:*

Giray Biyiklioglu appeals his conviction and sentence for wire fraud, aggravated identity theft, tax evasion, and money laundering. Because the government failed to produce evidence that certain fraudulent wires crossed state lines, that Biyiklioglu knew that one of his victims was an actual person, and that Biyiklioglu structured his financial transactions with the intent to evade taxes, we REVERSE Biyiklioglu's conviction as to counts 1–9, 11–14, 21,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-31003

and 22 of the indictment. Biyiklioglu's various challenges to his conviction of the remaining counts fail, and we AFFIRM his conviction as to counts 10, 15, 17–20, and 23–41. Because the sentences imposed for the reversed and affirmed counts of conviction are intertwined, we VACATE Biyiklioglu's sentence and REMAND for resentencing.

## I.

A jury convicted Giray Biyiklioglu of thirteen counts of wire fraud, six counts of aggravated identity theft, two counts of tax evasion, and nineteen counts of money laundering, all arising from a scheme in which Biyiklioglu transferred money online among his bank accounts and numerous fraudulent PayPal accounts and then disputed certain transactions so as to cause double payments to his bank accounts and corresponding losses to PayPal.[1] Evidence adduced at trial showed that Biyiklioglu created and controlled about thirty fraudulent PayPal accounts bearing names other than his own. He engaged in a pattern of transferring money from bank accounts in his name to the fraudulent PayPal accounts and then out to a different bank account through Automated Clearinghouse (ACH) transactions, and then disputing the ACH transactions with the first bank as unauthorized transfers.[2] This would often cause the first bank to credit the disputed ACH funds to Biyiklioglu's bank account and to debit the PayPal account. Because Biyiklioglu had already transferred the money out of the PayPal account, this would result in a loss to PayPal and a doubling of Biyiklioglu's money. In total, Biyiklioglu caused PayPal to lose more than $418,000 through ACH reversals.

---

[1] PayPal is a global payment processor business that allows customers to make payments and send money transfers through the Internet.

[2] Automatic Clearing House is a system that allows banks to make automated transfers of a large number of debits and credits to banks across the United States.

No. 14-31003

At trial, Biyiklioglu admitted that he owned all twenty-four bank accounts identified in the indictment. These accounts were with six different banks, all with locations in the Eastern District of Louisiana. He also admitted that he had disputed certain transfers from these accounts, resulting in tens of thousands of dollars in ACH reversals from PayPal. Other trial evidence showed that Biyiklioglu created a company, Big Stake Investments, L.L.C., of which he was the sole member, and that he used accounts of Big Stake Investments as part of the PayPal fraud scheme. The evidence also showed that Biyiklioglu sent PayPal identification documents, bank statements, and utility bills, many of which were falsified, to set up the fraudulent PayPal accounts. Biyiklioglu's laptop computer contained information related to two of the fraudulent PayPal accounts.

The jury found Biyiklioglu guilty on all forty counts on which he was tried.[3] The district court denied Biyiklioglu's motions for acquittal and sentenced him to 192 months' imprisonment. Biyiklioglu filed this appeal challenging his conviction and sentence.[4] Biyiklioglu argues that: (1) he was deprived of his right to self-representation at trial; (2) the evidence was insufficient to sustain his conviction for wire fraud, aggravated identity theft, tax evasion, and money laundering; (3) the district court improperly admitted evidence related to twenty-two PayPal accounts not included in the indictment; (4) the district court gave the jury erroneous instructions on a number of issues related to the wire fraud and tax evasion charges; (5) "spillover" from invalid claims may require a new trial on the remaining claims; and (6) the district

---

[3] Biyiklioglu was tried on counts 1–15 and 17–41 of the Second Superseding Indictment. The government dismissed count 16 on the morning of the first day of trial because it had been unable to secure the appearance of the victim in that count.

[4] Biyiklioglu was represented by court-appointed counsel in the district court and when he filed his appeal. We granted Biyiklioglu's motion to relieve his counsel and allow him to proceed *pro se*, and Biyiklioglu filed his briefs *pro se*.

No. 14-31003

court erred in enhancing Biyiklioglu's sentence based on its findings of the loss amount, the number of victims, the unusual vulnerability of some victims, and Biyiklioglu's obstruction of justice.

## II.

Biyiklioglu first argues that he was denied his right to self-representation. The Sixth Amendment guarantees the right of a criminal defendant to represent himself at trial. *Faretta v. California*, 422 U.S. 806, 818 (1975). To invoke the right, "[t]he defendant must knowingly and intelligently forego his right to counsel, and must clearly and unequivocally request to proceed *pro se.*" *United States v. Long*, 597 F.3d 720, 724 (5th Cir. 2010). Furthermore, even if the defendant has knowingly and voluntarily chosen to represent himself after a *Faretta* hearing at which the trial court must caution him about the dangers of self-representation, "the defendant may waive his right to self-representation through subsequent conduct indicating an abandonment of the request." *Long*, 597 F.3d at 724. "The denial of a defendant's right to represent himself, if established, requires reversal without a harmless error analysis." *United States v. Majors*, 328 F.3d 791, 794 (5th Cir. 2003).

In a letter to the district court before trial, Biyiklioglu wrote, "I want to leave the court appointed counsel and wish to represent myself pro-se at this point," and explained that he was dissatisfied with his counsel's performance and communications. The district court held a *Faretta* hearing at which Biyiklioglu again stated his wish to represent himself. In response to the district court's inquiries, Biyiklioglu explained that he was frustrated at not having been allowed to file various *pro se* motions while represented by counsel. The district court explained that it would allow Biyiklioglu to file his motions with or without a lawyer, and that it would recommend the appointment of a specific new defense attorney, who would "give you the

attention that you need, that you deserve, and his demeanor, I think, is one that you'll get along with him, okay." Biyiklioglu responded, "Thank you very much, Your Honor." Later in the hearing, the district court stated that Biyiklioglu's *pro se* motions would not be filed into the record until he talked to his new lawyer, after which the district court would allow him to file his motions if he still wanted to do so. Biyiklioglu agreed.

Before the end of the hearing, the government's counsel confirmed for the record that Biyiklioglu was content to proceed to trial with counsel after being allowed to file his motions:

> [Government counsel]: Your Honor, I just wanted to make the record just to continue what Mr. Biyiklioglu said about that he did not want to proceed as pro se he wanted an attorney to represent himself. He said to me, and if he will confirm that. He was not going to go to trial without an attorney. He wanted to kind of pro se, to go pro se to just file his motions, but did not intend to go to trial without an attorney representing him; is that correct?
>
> THE DEFENDANT: Yes, that's –
>
> [Government Counsel]: That's what you just told me. So I just wanted to make sure that he conveyed that to me, which he's already conveyed to the Court is that he always intended to go forward -- to trial with an attorney.
>
> THE COURT: Is that correct, Mr. Biyiklioglu?
>
> THE DEFENDANT: Yes, Your Honor. As I stated to you also, I said I wanted to represent myself to just file the motions by myself.

After the *Faretta* hearing, Biyiklioglu was allowed to file his motions and then proceeded to trial with his newly-appointed counsel. He did not raise the topic of self-representation again.

Even assuming that Biyiklioglu "clearly and unequivocally" invoked his right to self-representation, his subsequent statements before the end of the *Faretta* hearing "indicat[ed] an abandonment of the request" so as to waive his right to proceed *pro se*. *Long*, 597 F.3d at 724. Biyiklioglu thanked the district

No. 14-31003

court for appointing new counsel and agreed with government counsel's statement that Biyiklioglu had wanted to represent himself only for the purposes of filing the motions and had not intended to proceed to trial without counsel.    Under these circumstances, the district court did not err by appointing new counsel to represent Biyiklioglu at trial.

**III.**

Biyiklioglu next challenges the sufficiency of the evidence to support his various counts of conviction.  Where, as here, the defendant has preserved a sufficiency of the evidence challenge by timely moving for acquittal, we review the challenge *de novo*.  *United States v. Brown*, 727 F.3d 329, 335 (5th Cir. 2013).  We "must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

**A.**

Counts 1–13 of the indictment alleged wire fraud in violation of 18 U.S.C. § 1343.  "To prove wire fraud, the government must prove: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud."  *United States v. Kuhrt*, 788 F.3d 403, 413-14 (5th Cir. 2015), *cert. denied*, No. 15-6608, 2016 WL 854224 (U.S. Mar. 7, 2016).  A conviction under § 1343 "requires that the wire communication cross state lines."  *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (explaining that where relevant telephone calls were all intrastate, there was no act that could have constituted wire fraud); *United States v. Izydore*, 167 F.3d 213, 219 (5th Cir. 1999) ("[T]he communication at issue must satisfy the interstate nexus set forth in § 1343; it is an immutable

requirement.") (reversing wire fraud conviction based on intrastate telephone calls and noting that the interstate nexus requirement is not a substantive element of wire fraud but arises from constitutional limitations on congressional power over intrastate activities); 18 U.S.C. § 1343 (prohibiting transmission of fraudulent communication by wire "in interstate or foreign commerce"). The use of the Internet alone is insufficient to establish the required interstate nexus. *See United States v. Kieffer*, 681 F.3d 1143, 1155 (10th Cir. 2012) ("[O]ne individual's use of the internet, 'standing alone,' does not establish an interstate transmission . . . because the origin and host servers, whether one and the same or separate, might be located in the same state as the computer used to access the website.").

Biyiklioglu argues that the government did not prove the required interstate nexus as to counts 1–9 and 11–13. He argues that with respect to counts 2, 4, 5, 8, 9, 12, and 13, the government failed to prove that the money wired from PayPal's bank to Biyiklioglu's accounts crossed state lines, and that with respect to counts 1, 3, 6, 7, and 11,[5] the government did not prove that the identification information submitted to PayPal's computers originated from Biyiklioglu's Internet service provider in Louisiana. The government counters that "[b]ecause PayPal's data centers are located outside of Louisiana, the necessary result of a wire transfer directed by PayPal to Biyiklioglu's bank accounts in Louisiana is that the wire transfer crossed state lines," and that Biyiklioglu's wirings of victims' personal information to PayPal also crossed state lines because PayPal received all of the victims' information through the Internet outside of Louisiana, where Biyiklioglu and five victims lived.

---

[5] Biyiklioglu's briefs list counts 1, 2, 6, 7, and 11 for this argument, but he notified the court by motion that this was a typographical error.

No. 14-31003

The government's first argument fails. The evidence at trial established, and indeed it is undisputed, that PayPal engages with customers solely on the Internet, that PayPal has no data facilities in Louisiana, and that Biyiklioglu lived in Louisiana and had bank accounts there. The evidence also established that the ACH disputes associated with Biyiklioglu that caused PayPal's losses were faxed to PayPal's bank processor, Wells Fargo. Wells Fargo then transferred the disputed payments back to Biyiklioglu's bank accounts, and it is these wire transfers that give rise to counts 2, 4, 5, 8, 9, 12, and 13. There was no testimony, however, about where Wells Fargo was located, or where Biyiklioglu's or Wells Fargo's Internet servers were located.[6] It is possible that they were all located in Louisiana, such that the ACH wire transfers did not cross state lines, and there is no evidence in the record from which the jury could find otherwise beyond a reasonable doubt. In sum, there was no evidence as to the interstate nature of the ACH transfers from Wells Fargo to Biyiklioglu's bank accounts, regardless of the location of PayPal's data centers. *See Izydore*, 167 F.3d at 219 (reversing wire fraud conviction where evidence did not establish location of caller so as to establish interstate nexus).

The government cites *United States v. Mills* for the proposition that when a scheme is "an ongoing venture and not a 'one-shot' operation," and wire communications are "at the heart of the scheme and were of necessity interstate," the interstate nexus is established. 199 F.3d 184, 189–90 (5th Cir.

---

[6] The government has not cited to any such testimony, and the court's independent review of the trial record reveals none. Indeed, notwithstanding Biyiklioglu's argument to the court at the close of the government's case that the wire fraud charges failed because "there was no indication that one could foresee that these ACH forms would travel in interstate commerce," the government did not address the interstate nexus requirement in its closing argument. *Cf. United States v. Davis*, 735 F.3d 194, 199 (5th Cir. 2013) ("This court has admonished the government to exercise care in satisfying its burden of proving the financial-institution element in prosecuting bank fraud and other bank-related offenses, lest it suffer a reversed conviction on a seeming technicality.") (reversing conviction for bank fraud).

8

## No. 14-31003

1999).   However, the government has not pointed to any evidence that the transmissions of the ACH dispute information from Wells Fargo to PayPal—which necessarily crossed state lines if Wells Fargo was located in Louisiana—were at the heart of Biyiklioglu's scheme, nor does the court's review of the record reveal any such evidence.   For example, there is no evidence in the record that Wells Fargo transmitted the information to PayPal before refunding the disputed funds to Biyiklioglu's bank accounts or that Wells Fargo required authorization from PayPal to reverse the ACH transfers. Accordingly, the government has not established the required interstate nexus for the wire transfers in counts 2, 4, 5, 8, 9, 12, and 13, and we reverse Biyiklioglu's conviction as to those counts.  *See Izydore*, 167 F.3d at 219; *United States v. Garrido*, 713 F.3d 985, 998 (9th Cir. 2013) (reversing wire fraud conviction where fax was sent from one location in California to another).

As for the counts relating to Biyiklioglu's transfer of identification information to PayPal to set up fraudulent accounts, the government argues that PayPal received all of the victims' information through the Internet, and that "Biyiklioglu lived in Louisiana, as did five victims; he received the wire fraud proceeds there; and he controlled the victims' personal information, storing it on his computer and in his home and emailing it to his wife," such that "a rational fact-finder could find that Biyiklioglu's wirings of the victims' personal information crossed interstate lines."   However, as Biyiklioglu correctly argues, the government has not presented evidence of the particular wirings of identification information to PayPal that give rise to counts 1, 3, 6, 7, and 11, or any evidence that Biyiklioglu sent that information from his computer in Louisiana.[7]   The use of the Internet alone is insufficient to

---

[7] In contrast, the government presented evidence that the identification information in count 10 was sent to PayPal from a computer in Biyiklioglu's home.  Biyiklioglu does not challenge the jurisdictional nexus as to count 10.

establish that Biyiklioglu sent the information to PayPal across state lines. *See Kieffer*, 681 F.3d at 1155. Accordingly, the government has failed to establish the required interstate nexus for the alleged wire transmissions in counts 1, 3, 6, 7, and 11, and we reverse Biyiklioglu's conviction as to those counts.[8] *See Izydore*, 167 F.3d at 219; *Garrido*, 713 F.3d at 998.

Biyiklioglu challenges his conviction for count 10 on other grounds, arguing that "the government pleaded a single unitary scheme to defraud involving **false claims to banks** which it failed to prove" and the difference between the government's theory at trial and in the indictment requires reversal of Biyiklioglu's conviction. Biyiklioglu relies solely on *United States v. Mastelotto*, 717 F.2d 1238, 1248–49 (9th Cir. 1983) ("A defendant cannot be convicted of a count charging participation in a fraudulent scheme Y where the grand jury indicted based on his participation in a fraudulent scheme X, even if the schemes themselves overlap or are concentric."). *Mastelotto* was overruled by *United States v. Miller*, which explained that "an indictment may charge numerous offenses or the commission of any one offense in several ways" and "[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." 471 U.S. 130, 136 (1985); *see also United States v. Frega*, 179 F.3d 793, 803 (9th Cir. 1999) (noting *Mastelotto*'s overruling by *Miller*).

More importantly, there was no material variance between the indictment and the evidence at trial. *See United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007) ("A material variance occurs 'when the proof at trial

---

[8] We do not reach Biyiklioglu's remaining challenges to the sufficiency of the evidence supporting his conviction as to counts 1–9 and 11–13.

No. 14-31003

depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense.'") (quoting *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005)).  The indictment alleged a scheme "to defraud PayPal by making wire transfers to and from bank accounts in [Biyiklioglu's] name, using as intermediaries certain fraudulent PayPal accounts in the names of other individuals."  This is precisely what the evidence showed.  Accordingly, we affirm Biyiklioglu's conviction for wire fraud as to count 10.

### B.

Counts 14, 15 and 17–20 of the indictment alleged aggravated identity theft in violation of 18 U.S.C. § 1028A, with each count identifying a different victim whose identity Biyiklioglu used to open a false PayPal account.[9]  To establish aggravated identity theft, the government must prove that Biyiklioglu (1) knowingly (2) used the means of identification of another person (3) without lawful authority (4) during and in relation to an enumerated offense, including wire fraud. *United States v. Oliver*, 630 F.3d 397, 415 (5th Cir. 2011).  The government must show "that the defendant knew that the means of identification at issue belonged to another person." *Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009).

Biyiklioglu argues that his conviction for count 14 should be reversed because the government failed to prove that he knew that the victim, James Smith, was an actual person.  He argues that James Smith is a very common name, that the only identifying information submitted to PayPal in addition to Smith's name was an address, and that the address was of an apartment building that Smith had lived at more than twenty years earlier.

---

[9] As noted above, count 16, which also alleged aggravated identity theft, was dismissed shortly before the trial began.

No. 14-31003

The government responds that other circuits have held that knowledge that aggravated identity theft victims are actual people can be proven by evidence of the defendant's willingness to test the means of identification by submitting it to a verification process. However, as Biyiklioglu correctly argues in reply, the cases cited by the government emphasize that *repeated* successful submission of identification information can show knowledge that the victim is a real person. *See United States v. Foster*, 740 F.3d 1202, 1207 (8th Cir. 2014) ("The conspirators' repeated subjection of [the victim's] identity to a lender's scrutiny provides strong circumstantial evidence that the conspirators knew the identity was real."); *United States v. Valerio*, 676 F.3d 237, 244–45 (1st Cir. 2012) ("Valerio repeatedly subjected the [victim's] identity to government scrutiny. . . . A 'willingness to subject [a] social security card repeatedly to government scrutiny' is evidence that allows a reasonable jury to find that a defendant knew that a stolen identity belonged to a real person.") (citation omitted); *United States v. Doe*, 661 F.3d 550, 563 (11th Cir. 2011) ("Perhaps most significant, Doe repeatedly and successfully tested the authenticity of [the victim's] identifying information prior to submitting the passport application to the United States Department of State."). Here, in contrast, the evidence at trial established only that Biyiklioglu on one occasion submitted Smith's name and former address—along with a bank account, credit card, and e-mail address that were not actually Smith's—to PayPal.

Nor did the evidence at trial establish that Biyiklioglu's conduct was similar to other situations that the Supreme Court has stated would establish the requisite knowledge. *See Flores-Figueroa*, 556 U.S. at 656 ("[W]here a defendant has used another person's identification information to get access to that person's bank account, the Government can prove knowledge with little difficulty. The same is true when the defendant has gone through someone else's trash to find discarded credit card and bank statements, or pretends to

12

be from the victim's bank and requests personal identifying information. Indeed, the examples of identity theft in the legislative history (dumpster diving, computer hacking, and the like) are all examples of the types of classic identity theft where intent should be relatively easy to prove, and there will be no practical enforcement problem."). Here, there was no evidence as to how Biyiklioglu obtained Smith's name and former address. Unlike the victims in the other charged counts of aggravated identity theft, Smith lived in Washington, and there was no evidence suggesting that he and Biyiklioglu had ever encountered one another.[10] Under these circumstances, the evidence did not permit the jury to find beyond a reasonable doubt that Biyiklioglu knew Smith was a real person, and we therefore reverse his conviction as to count 14.[11]

## C.

Counts 21 and 22 alleged tax evasion for the years 2010 and 2011, respectively, in violation of 26 U.S.C. § 7201. To convict Biyikligolu of tax evasion under § 7201, the government was required to prove: (1) the existence

---

[10] The government cites to the testimony of Biyiklioglu's ex-wife that he had told her a $300 payment from PayPal would be coming to her from James Smith, whom Biyiklioglu described as "his friend." However, in light of Smith's and Biyiklioglu's uncontroverted testimony that they did not know each other, Biyiklioglu's statement to his then-wife that Smith was his friend demonstrates only that he lied to her to allay her suspicions about the source of the transfer, not that he knew Smith was a real person.

[11] Biyiklioglu also summarily argues that counts 17–20 should be reversed because "[t]he identity victims were total strangers to the defendant. The victims and defendant testified that they did not know each other," and the evidence was therefore "insufficient to find that the defendant knew the victims were actual people." Assuming, *arguendo*, that this argument is not too conclusory to preserve his challenge on appeal, the evidence at trial was sufficient for the jury to conclude that Biyiklioglu knew that the victims in counts 17–20 were actual people. All four of those victims testified that they had worked at a restaurant that Biyiklioglu admitted frequenting, one of them recognized him and had waited on him, and Biyiklioglu submitted to PayPal the correct social security numbers of at least three of the four victims. We affirm Biyiklioglu's conviction as to counts 17–20.

Biyiklioglu does not challenge his conviction for count 15, for which he admits knowing the victim.

of a tax deficiency; (2) an affirmative act constituting an evasion or an attempted evasion of the tax; and (3) willfulness. *United States v. Miller*, 588 F.3d 897, 907 (5th Cir. 2009). Biyiklioglu challenges the sufficiency of the evidence as to the first two elements.

First, Biyiklioglu argues that the government failed to establish that he had substantial tax due in 2010 and 2011 because the government's witness "testified that her calculations were **preliminary**, **premature**, and did not include any **cash transactions**," and that "without auditing the defendant, I.R.S. would **not be able to determine** cash transactions, correct amount of credits and deductions the defendant was entitled to."

The evidence at trial amply proved the existence of a tax deficiency. Internal Revenue Service (IRS) agent Denise O'Grady, who was certified without objection as an expert in the computation of federal income taxes, testified that she examined more than seventy-four bank accounts held by Biyiklioglu during 2010 and 2011. She classified as income only the ACH reversals that doubled Biyiklioglu's money. O'Grady treated funds that were seized, frozen, or returned to PayPal as refunds that were not included as income. She also deducted $3,400 based on the single deposit that was consistent with the sale of merchandise, although she concluded that "[t]here was no indication [that any of the bank transactions] were related to any type of jewelry business."[12] After applying standard deductions and making further assumptions that minimized Biyiklioglu's tax liability, O'Grady calculated tax liabilities of $17,377 for 2010 and $39,023 for 2011. It is undisputed that Biyiklioglu did not file income tax returns in 2010 or 2011.

The testimony on which Biyiklioglu relies does not undermine this evidence of a tax liability. O'Grady testified on cross-examination that the

---

[12] Biyiklioglu testified that he earned income by buying and selling jewelry and gold.

documents she had examined would not reflect any cash transactions that did not go through a bank, but explained that if Biyiklioglu were engaging in such transactions as part of a business, both business expenses and income would be underreported in her calculations. She agreed that her report was "preliminary" and subject to revision to the extent that she lacked access to additional documentation. However, in light of O'Grady's conservative approach to the calculations and the size of the tax liabilities, the possibility of small adjustments to the amount of tax owed does not call into question whether Biyiklioglu owed taxes for 2010 and 2011. *See United States v. Bishop*, 264 F.3d 535, 550 (5th Cir. 2001) ("The government must demonstrate the existence of a deficiency beyond a reasonable doubt, but need not prove the extent of the deficiency with mathematical certainty."); *United States v. Parr*, 509 F.2d 1381, 1385–86 (5th Cir. 1975) ("The government need not prove the exact income alleged in the indictment nor evasion of the entire tax charged, so long as it is shown that a substantial portion of tax was evaded.") (footnotes omitted) (explaining that any error in the calculation of tax liability was irrelevant where the government had proven a substantial tax liability). Accordingly, the government established the existence of a tax deficiency.

Biyiklioglu also argues that the government did not prove the second element required for a conviction under § 7201, an affirmative act constituting an evasion or attempted evasion of tax. The indictment identifies his "affirmative acts of evasion" as "concealing and attempting to conceal from all proper officers of the United States of America his true and correct income, opening multiple bank accounts, opening and using PayPal accounts in other people's names, and forming Big Stake Investments LLC and opening bank accounts in its name." Biyiklioglu argues that: (1) he did not file any tax returns or make false reports of any kind so as to affirmatively conceal his income; (2) the bank accounts were opened using his name and social security

number, and the fact that there were multiple accounts did not result in greater secrecy; (3) opening and using PayPal accounts in other people's names did not conceal income because all of the transfers occurred between PayPal and Biyiklioglu's bank accounts and could be easily traced by reviewing his bank statements; and (4) Big Stake Investments and all of the bank accounts opened for it were opened with Biyiklioglu's name and social security number, so there was no increase in secrecy.

"The mere failure to pay a tax voluntarily when due, even if willful, does not establish a criminal attempt to evade." *United States v. Nolen*, 472 F.3d 362, 379 (5th Cir. 2006). "Affirmative acts that satisfy the second element [of § 7201] may include keeping double sets of books, concealment of assets, or 'any conduct, the likely effect of which would be to mislead or to conceal.'" *Miller*, 588 F.3d at 907 (quoting *Spies v. United States*, 317 U.S. 492, 499 (1943)). "If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." *Spies*, 317 U.S. at 499.

The evidence at trial proved that Biyiklioglu created numerous bank accounts and structured elaborate transactions to defraud PayPal and to conceal his fraud from PayPal and the banks. The government, relying on this evidence, conclusorily argues that "[t]he evidence sufficiently established the affirmative acts supporting [Biyiklioglu's] conviction" for tax evasion. However, the government has not identified any evidence suggesting that a motive to evade taxes contributed to this deception, nor does the court's own review of the trial record reveal any such motive. Indeed, the government fails even to argue that Biyiklioglu was motivated by a desire to evade taxes. In *United States v. Jones*, we held that a defendant's "placing money on circuitous paths of cashier's checks and funneling it into a house purchased through a convoluted scheme designed to put it out of reach" was sufficient to support his

conviction for tax evasion.  459 F. App'x 379, 384 (5th Cir. 2012).  Jones, however, took these actions "while his tax file was in active collection," and the evidence supported the government's contention that the only conceivable reason for his conversion of fees into cashier's checks—which Jones failed to report in his financial statement to the IRS—was to evade taxes.  *Id.*  Here, in contrast, the obvious explanation for Biyiklioglu's complex and circuitous transactions was the perpetuation of his fraud, and there is no evidence that he took any action for the purpose of evading tax liability.  Accordingly, we reverse Biyiklioglu's conviction for tax evasion as to counts 21 and 22.

### D.

Counts 23–41 alleged money laundering under three different statutory provisions.  Counts 23–26 alleged that Biyiklioglu engaged in monetary transactions involving criminally derived property of a value greater than $10,000, namely, the purchases of three motorcycles and a jet ski, in violation of 18 U.S.C. § 1957.  Counts 27–39 alleged that he transferred wire fraud proceeds in transactions designed to conceal and disguise the nature, location, source, ownership, and control of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Counts 40 and 41 alleged that he transmitted wire fraud proceeds to Turkey in violation of 18 U.S.C. § 1956(a)(2)(B)(i).  Biyiklioglu challenges the sufficiency of the evidence as to all but two counts of money laundering.[13]

Biyiklioglu argues that his conviction under § 1957 in counts 23 and 26 must be reversed because, among other reasons, "the government failed to prove that there was a wire fraud and interstate wires were used in the furtherance of the crime."  "To prove the money laundering count under § 1957,

---

[13] Biyiklioglu does not challenge his conviction under § 1957 as to counts 24 and 25, and his conviction is affirmed as to those counts.

the government had to prove that [Biyiklioglu] knowingly engaged in a monetary transaction in criminally derived property of a value greater than $10,000 and that the property was derived from specified unlawful activity." *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005); 18 U.S.C. § 1957(a) ("Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."); *see also* 18 U.S.C. §§ 1957(f)(3), 1956(c)(7)(A), 1961(1) (defining "specified unlawful activity" as used in § 1957 to include wire fraud). The government responds only that the evidence was sufficient to convict Biyiklioglu of wire fraud.  However, as explained above, the government did not prove the requisite interstate nexus as to twelve counts of wire fraud because, and there is no evidence that the transactions in counts 23 and 26 involved funds associated with the sole surviving wire fraud count. Accordingly, the government has not proven that the transactions in counts 23 and 26 involved the proceeds of a specified unlawful activity.  We therefore reverse Biyiklioglu's conviction for money laundering in counts 23 and 26.

Biyiklioglu challenges his conviction under § 1956(a)(1)(B)(i) in counts 27–39 and under § 1956(a)(2)(B)(i) in counts 40 and 41, arguing that the government failed to prove that the transactions were designed to conceal unlawful activity.  *See United States v. Bieganowski*, 313 F.3d 264, 279 (5th Cir. 2002) ("The offense of money laundering under section 1956(a)(1)(B)(i), requires that the government prove that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) that the defendant knew involved the proceeds of unlawful activity, and (3) that the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.  An offense under section 1956(a)(2)(B)(i) is almost identical, with the exception that the transaction in

No. 14-31003

question must be from a place in the United States to a place outside the United States.") (citations omitted).  Determining whether specific intent to commit money laundering has been proven is a fact-bound inquiry that frequently turns upon circumstantial evidence.  *United States v. Trejo*, 610 F.3d 308, 315 (5th Cir. 2010).

The evidence at trial was sufficient for the jury to conclude that Biyiklioglu structured his transactions to conceal the proceeds of his fraudulent scheme.  Biyiklioglu engaged in various circuitous transactions between his numerous bank accounts, often on the same day, that served no apparent purpose other than to disguise the source of the money.  For example, on February 2, 2012, Biyiklioglu made two separate deposits of $15,000 each into one of his Bank of America accounts, then made two transfers of $15,000 each from that account into a Chase account, then made two transfers of $15,000 each from that Chase account into a different Chase account, and then withdrew $25,000 of that money from the second Chase account in two separate cash withdrawals.[14]  *Cf. United States v. Willey*, 57 F.3d 1374, 1386 (5th Cir. 1995) ("Moving money through a large number of accounts has, in the light of other evidence, also been found to support the design element of this offense, even when all the accounts to which the defendant transferred the money and from which he withdrew it were in his own name.").  Biyiklioglu also told a bank representative that he would receive automatic deposits from PayPal into certain accounts but did not want PayPal to have access to the

---

[14] Biyiklioglu argues that his purpose in these transactions was merely to access his cash at a local bank branch because Bank of America did not have a branch in New Orleans. However, this explanation does not account for the serial transfers first to one Chase account and then to another.  Moreover, to the extent that Biyiklioglu offered an alternative explanation for the transfers, the jury was not obligated to believe him.  *Cf. United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002) (affirming money laundering conviction where "the jury was free to discredit Rodriguez's explanation of the source of the funds and did so.").

No. 14-31003

accounts in any way or to be able to see his balances.  Moreover, shortly after some of his accounts were frozen, Biyiklioglu formed a business organization with no recorded business activity, in which Biyiklioglu was the only member, and used it to open additional bank accounts to further his fraudulent scheme. In total, Biyiklioglu used at least seventy-four bank accounts while engaged in his scheme.

Biyiklioglu argues that the charged transactions did not conceal his ownership of the money because each transaction was an ordinary, straightforward banking transaction.  However, "in order to establish the design element of money laundering, it is not necessary to prove with regard to any single transaction that the defendant removed all trace of his involvement with the money or that the particular transaction charged is itself highly unusual."  *Willey*, 57 F.3d at 1386.  "That is, it is not necessary that a transaction be examined wholly in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds."  *Id.*; *accord United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002).  Here, the government produced ample evidence from which the jury could conclude that Biyiklioglu intended to conceal the fraudulent source of his funds through the transactions in counts 27–41.  Accordingly, we affirm Biyiklioglu's conviction as to counts 27–41.

## IV.

Biyiklioglu argues that the district court violated Federal Rule of Evidence 404(b) when it admitted government exhibit 4.2, a summary of Biyiklioglu's fraudulent scheme that referenced twenty-two PayPal accounts not included in the indictment.  Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence "may be admissible for another purpose, such

as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

During the trial, Biyiklioglu's counsel objected "to any PayPal record other than the PayPal records of the witnesses who have testified up to this point," and upon admission of exhibit 4.2, objected "to the base information which . . . resulted in this summary." Biyiklioglu did not cite to any evidentiary rule, and the district court reasonably construed the objection as going to the relevance of the evidence. "To preserve error, an evidentiary objection must 'state[] the specific ground, unless it was apparent from the context.' . . . A loosely formulated and imprecise objection will not preserve error." *United States v. Lewis*, 796 F.3d 543, 545–46 (5th Cir. 2015) (quoting Fed. R. Evid. 103(a)(1)(B)). Because Biyiklioglu's general objection did not apprise the district court that he objected under Rule 404(b), we review his evidentiary challenge for plain error. *See id.* at 546 ("We conclude that Lewis failed to fully apprise the court of the grounds of his objection or to alert it to the proper course of action. Accordingly, this error was unpreserved, and plain error review applies.").

To establish plain error, Biyiklioglu must show that: (1) the district court erred, (2) the error was clear or obvious, (3) the error affected his substantial rights, and (4) this court should exercise its discretion to correct the error because the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*; *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Biyiklioglu has not established that the district court erred, much less that any error was plain. Rule 404(b) does not govern evidence that is "intrinsic" to the offense charged. *Freeman*, 434 F.3d at 374. "Evidence of acts other than conduct related to the offense is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary

21

preliminaries to the crime charged." *Id.* (internal quotation marks and citation omitted).  The PayPal investigator who compiled the government's exhibit 4.2 testified that he had reviewed all of the represented PayPal accounts, along with related bank records, and identified a consistent fraudulent pattern whereby Biyiklioglu transferred money from one bank account into the PayPal account, sent it to a second bank account, and then disputed the original transaction, resulting in a refund to the first bank account and a loss to PayPal. This testimony was corroborated by several other witnesses.  The uncharged PayPal accounts with their respective losses and transfers were therefore inextricably intertwined with the transactions charged in the indictment as part of a single fraudulent scheme and were admissible as intrinsic evidence not subject to Rule 404(b).

However, even assuming, *arguendo*, that the uncharged PayPal accounts were extrinsic evidence, the district court still did not err in admitting exhibit 4.2.  Rule 404(b) allows the admission of extrinsic evidence for a purpose other than proving the person's character, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  Here, evidence concerning a large number of PayPal accounts that were associated with Biyiklioglu's bank accounts and fit the same loss pattern as the PayPal accounts in the indictment was highly probative of Biyiklioglu's intent, knowledge, motive, and plan regarding the wire fraud scheme alleged in the indictment.  *See United States v. Cooks*, 589 F.3d 173, 182 (5th Cir. 2009) (affirming admission in fraud case of five uncharged transactions, four of which "were materially indistinguishable from the charged schemes," and explaining that "extrinsic evidence of using the same scheme repeatedly is relevant to intent, knowledge, motive and plan"). Accordingly, Biyiklioglu has not demonstrated that the district court plainly erred by admitting government exhibit 4.2.

## V.

Biyiklioglu challenges the district court's jury instructions relating to the wire fraud charges.[15]     Because Biyiklioglu did not object to the jury instructions before the district court, we review his challenges for plain error. *See United States v. Harris*, 740 F.3d 956, 965 (5th Cir. 2014).  As discussed above, this requires Biyiklioglu to show an error that is plain and that affected his substantial rights, and also that we should exercise our discretion to correct the error because the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.* at 965–66.

Biyiklioglu first argues that the district court erred when it instructed the jury that "[a] specific intent to defraud means a conscious, knowing intent to deceive or cheat someone" because the word "deceive" did not require the jury to find that Biyiklioglu acted for the purpose of obtaining financial gain. The district court's instruction defining "specific intent to defraud" followed the Fifth Circuit pattern jury instruction verbatim.  *See* Pattern Crim. Jury Instr. 5th Cir. 2.57.  Moreover, the instruction is consistent with our precedent.  *See United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002) ("A conviction for wire fraud requires proof of the specific intent to defraud or deceive.").  Accordingly, the district court did not err in its definition of "specific intent to defraud" when instructing the jury on the elements of wire fraud.

Biyiklioglu also argues that the district court constructively amended the indictment by instructing the jury that to convict Biyiklioglu of wire fraud, the jury must find that he "knowingly devised or intended to devise *any* scheme to defraud."  (emphasis added).  Biyiklioglu's argument is premised on the assertion that the jury heard evidence about eight separate PayPal schemes

---

[15] Biyiklioglu also challenges the jury instructions on tax evasion, but those challenges are moot because we reverse Biyiklioglu's conviction for both counts of tax evasion.

involving eight separate victims, including one scheme that was described in the indictment but was not charged because the government dropped the aggravated identity theft charge related to that scheme's victim. Biyiklioglu argues that the jury could have convicted him on the wire fraud counts based on this uncharged scheme to defraud PayPal as to the one victim who did not testify. His argument fails, however, because the indictment alleged not eight distinct schemes, but rather an overarching fraudulent scheme to defraud PayPal by creating false accounts, including the eight described in the indictment. Biyiklioglu therefore was not convicted of a separate crime from the one for which he was indicted. *See United States v. Jara-Favela*, 686 F.3d 289, 300 (5th Cir. 2012) ("We 'scrutinize any difference between an indictment and a jury instruction' and 'will reverse only if that difference allows the defendant to be convicted of a separate crime from the one for which he was indicted.'") (quoting *United States v. Nunez*, 180 F.3d 227, 231 (5th Cir. 1999)). Biyiklioglu has not established that the district court's jury instructions were erroneous, much less that there was any plain error.

## VI.

Biyiklioglu argues that if we reverse some but not all of his counts of conviction, we will need to determine "if prejudicial spillover from evidence introduced in support of the reversed counts requires the remaining convictions to be upset." Biyiklioglu relies exclusively on *United States v. Edwards*, in which we addressed a similar claim for the first time. 303 F.3d 606, 639 (5th Cir. 2002) ("This circuit has never addressed whether spillover from invalid claims can be a basis for granting a new trial."). In *Edwards*, we concluded:

> While we are willing to acknowledge that perhaps a grant of a new trial might be appropriate in some cases of "retroactive misjoinder," that case is not before us. At a minimum, drawing from our severance cases and authority from other circuits, the

24

No. 14-31003

defendants must show that they experienced some prejudice as a result of the joinder of the invalid claims, i.e., that otherwise inadmissible evidence was admitted to prove the invalid fraud claims. They have not, and cannot do so [because the challenged evidence was relevant to other counts and admissible on other theories].

*Id.* at 640. In *Edwards*, the "invalid" claims had been dismissed because they were based on a legal theory rejected by the Supreme Court. *Id.* at 612, 638–39. Here, in contrast, Biyiklioglu has not even argued, much less established, that any charged count was legally "invalid" in this way, but rather merely that the government failed to prove all of the elements of some of the charged offenses. Accordingly, *Edwards* is inapposite and Biyiklioglu's "spillover" argument fails.

## VII.

For the foregoing reasons, we REVERSE Biyiklioglu's conviction as to counts 1–9, 11–14, 21, and 22 of the indictment, and we AFFIRM his conviction as to counts 10, 15, 17–20, and 23–41. Because the sentences imposed on these counts were intertwined, we VACATE Biyiklioglu's sentence and REMAND for resentencing on the affirmed counts of conviction.[16]

---

[16] *See United States v. Dupaquier*, 74 F.3d 615, 619 (5th Cir. 1996) (reversing conviction as to one count and vacating sentence and remanding for resentencing on two remaining counts "[b]ecause the sentences imposed by the district court on the three counts were intertwined"). Because we vacate Biyiklioglu's sentence in its entirety, we do not reach Biyiklioglu's challenges to the sentencing enhancements applied by the district court.