Revised March 2, 1999

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 97-50537**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**MARK IZYDORE; HARRY SCHREIBER,**

**Defendants-Appellants.**

---

Appeals from the United States District Court
for the Western District of Texas

---

February 8, 1999

Before WIENER, BARKSDALE, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Appellants Harry Schreiber ("Schreiber") and Mark Izydore ("Izydore") were convicted on one count of conspiracy to commit wire fraud and bankruptcy fraud, and numerous counts of the substantive offenses of wire fraud and bankruptcy fraud. On appeal they challenge the propriety of their convictions and sentences. We vacate two of the appellants' convictions for wire fraud, affirm all the appellants' other convictions, and vacate their sentences

for resentencing on remand.


## I.  FACTS

Marhil Manufacturing ("Marhil") was a family-run business in Smithville, Texas, that manufactured doors, hatches, and other closures for the marine industry.  The company was owned by JoAnn Copeland, Joe Copeland, and Mrs. Copeland's son, Craig Wallace ("Wallace").  In the late 1980s Marhil encountered financial difficulties and was forced to file for bankruptcy under Chapter 11 of the United States Bankruptcy Code.  11 U.S.C. § 1101, *et seq.* In an effort to turn the company around, Marhil began an active search for outside investors who could provide operating capital for the business.  Wallace, who was Marhil's president at the time, subsequently was introduced to the appellants.  Negotiations ensued and the parties eventually agreed that the appellants' company, Westminster Financial ("Westminster"), would provide Marhil with the capital it needed pursuant to a stock subscription agreement.

Under the terms of the agreement Westminster was to purchase 185 shares of Marhil stock for the sum of $185,000.  The proceeds from the sale were to be used to pay Marhil's creditors and otherwise fund its plan of reorganization.  The sale was scheduled to occur on September 10, 1990.  Thereafter, it was agreed that Westminister would establish a $250,000 line of credit for Marhil,

which would be used to fund business operations.

Shortly after the stock subscription agreement was incorporated into the bankruptcy court's order confirming Marhil's plan of reorganization, the appellants formed Marhil Acquisition Corp. ("MAC"), a Colorado corporation, and opened several bank accounts in Florida for MAC, and a second company, M.C.M. Acquisitions Corp., Inc. Izydore then arranged to have Marhil's receivables factored through Goodman Factors, Inc. by falsely representing himself as the president of Marhil. The proceeds from the factoring were subsequently transferred to MAC's bank account in Florida. In all, the appellants factored $378,487 worth of Marhil's receivables.

In addition to factoring Marhil's receivables, the appellants instructed Wallace to apply for a progress payment from National Steel and Shipbuilding Co. ("NASSCO"), a company for which Marhil was manufacturing marine closures under a substantial contract.[1] NASSCO complied with the request and sent Marhil a progress payment of $197,490. On the appellants' instructions Wallace forwarded the payment to appellants, who deposited it in the MAC bank account in Florida. It was later determined that no portion of the progress payment was ever used to complete the NASSCO project. Instead, some of the money went to the personal expenses of the appellants; credit card balances; homes in Aspen, Colorado and West Palm Beach,

---

[1] Progress payments allow a company to pay for remaining materials and labor needed to complete a project under contract.

Florida; and Schreiber's BMW, to name a few. When asked to account for the funds, the appellants claimed, amongst other things, that $25,000 had been paid to a company called Michellette Corp., and that $35,000 had gone to a law firm named Jacobson & Lambert, P.A. Those statements were later shown to be false.

By December 1990, the appellants had still not purchased Marhil's stock as required by the subscription agreement and the reorganization plan. Consequently, a creditor filed suit seeking to rescind the bankruptcy court's order confirming the plan of reorganization. At a subsequent hearing before the bankruptcy court, the appellants claimed that $225,000 had been deposited in Marhil's account, that checks had been issued to all creditors, and that the new Marhil stock had been issued in accordance with the reorganization plan. After taking that testimony, the bankruptcy court continued its consideration of the matter until January 17, 1991.

On January 15, 1991, Wallace received a fax from Schreiber stating that Schreiber had stopped payment on a check that had been issued to one of its creditors. Wallace then learned that Schreiber had used a blank check that Wallace had given him for incidental expenses to withdraw the $225,000 deposit. At the January 17 hearing, the bankruptcy court was presented with compelling evidence that the appellants' representations at the previous hearing were false. Accordingly, the court revoked the plan of reorganization and appointed a Chapter 11 trustee to

4

oversee Marhil's operations.  On a subsequent audit of Marhil's books, the trustee discovered that the appellants had stolen $108,000 from Marhil.  The trustee's attempts to save the business were unavailing; she was forced to close Marhil based on its inability to meet its business obligations.

On September 19, 1995, a grand jury indicted the appellants on nine counts.  Count one charged the appellants with conspiracy to commit wire fraud and bankruptcy fraud, in violation of 18 U.S.C. § 371.  Counts two through six charged the appellants with committing wire fraud in violation of 18 U.S.C. § 1343, and aiding and abetting wire fraud in violation of 18 U.S.C. § 2.  Counts seven through nine charged the appellants with bankruptcy fraud in violation of 18 U.S.C. § 152, and aiding and abetting bankruptcy fraud in violation of 18 U.S.C. § 2.  The case went to trial and a jury convicted the appellants on all counts.  The district court subsequently sentenced Izydore to 60 months imprisonment and Schreiber to 120 months.  The appellants now appeal their convictions and sentences.

## II.  CHALLENGES TO EVIDENTIARY RULINGS

The appellants argue that the district court committed reversible error by allowing Bettina Whyte ("Whyte"), the bankruptcy trustee, to give opinion testimony regarding the legality of the appellants' conduct.  At trial, when asked to characterize the $108,500 that the appellants owed Marhil, Whyte

5

stated "[the money] was taken, and it was not legally taken in my opinion, which was what I said in my report to the court." Whyte was not testifying as an expert witness when she made this statement. The appellants timely objected to Whyte's statement, and asked the court to strike it from the record. The district court overruled the objection.

We review a district court's decision to admit evidence under the abuse of discretion standard. *United States v. Wallace*, 32 F.3d 921, 927 (5th Cir. 1994). However, we will not reverse a district court's evidentiary rulings unless substantial prejudice results to the complaining party. Fed. R. Evid. 103(a); *Munn v. Algee*, 924 F.2d 568, 573 (5th Cir.), *cert. denied*, 502 U.S. 900 (1991). The burden of proving substantial prejudice lies with the party asserting error. *FDIC v. Mijalis*, 15 F.3d 1314, 1318 (5th Cir. 1994).

In this appeal the appellants assert that Whyte's statement is inadmissible because it constitutes a legal conclusion regarding the ultimate issue of their guilt. They argue that her testimony was particularly prejudicial given her role as court-appointed trustee. In the government's view, Whyte's statement merely explains the circumstances surrounding her attempt to recover the missing funds, and does not reflect a judgment on the criminal guilt or innocence of the appellants.

Under Rule 704(a), "[t]estimony in the form of an opinion or

6

inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); *see United States v. Moore*, 997 F.2d 55, 57-58 (5th Cir. 1993) (discussing Rule 704(a)).  That rule, however, does not allow a witness to give legal conclusions.  *Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983).  For that reason we have long recognized that determinations of guilt or innocence are solely within the province of the trier of fact.  *United States v. Buchanan*,  70 F.3d 818, 833 n.20 (5th Cir. 1995), *cert. denied*, 517 U.S. 1114 (1996); *United States v. Masson*, 582 F.2d 961, 964 n.5 (5th Cir. 1978).

Here, there are two visible flaws in the appellants' argument. First, we are not at all convinced that the phrase "it was not legally taken" is a legal conclusion regarding the very specific issue of whether the appellants are guilty of conspiracy, wire fraud, and bankruptcy fraud.  Whyte made this statement while testifying at length about her efforts as trustee to account for monies belonging to Marhil.  When viewed in this context Whyte's statement is more accurately described as an opinion about whether the $108,000 properly belonged to Marhil, or the appellants.  It is not a legal conclusion regarding the ultimate issue of whether the appellants were guilty of the crimes charged in the indictment.

Second, even if it is a legal conclusion that was mistakenly admitted, we have reviewed the record as a whole and cannot

7

conclude that Whyte's statement, which consists of that single remark, affected the substantial rights of the appellants. Any mistake by the district court in admitting Whyte's statement was harmless error.

The appellants also contend that the district court erred in excluding as hearsay four transcripts from various proceedings in the bankruptcy court. They assert that the transcripts did not constitute hearsay because they were offered not to prove the truth of the matter asserted, but to show that false and misleading statements were made to the bankruptcy court. The appellants did not adequately raise this issue below, and we detect no plain error that would require us to consider it on appeal. *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1196 (1995).


## III. SCHREIBER'S SUFFICIENCY CLAIMS

Schreiber brings sufficiency of the evidence challenges to all of his convictions. He preserved this claim for appellate review by moving for judgment of acquittal at close of government's case, and at the close of evidence. *United States v. Pankhurst*, 118 F.3d 345, 351 (5th Cir.), *cert. denied*, 118 S. Ct. 630 (1997). The district court denied those motions. We review *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Myers*, 104 F.3d 76, 78 (5th Cir.), *cert. denied*, 117 S.

Ct. 1709 (1997). In evaluating the sufficiency of the evidence we must affirm the verdict "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Id.*

We have reviewed the record in this case, Schreiber's arguments on appeal, and the applicable law, and conclude that there is sufficient evidence supporting Schreiber's convictions for conspiracy under count one; wire fraud under counts two, five, and six; and bankruptcy fraud under counts seven through nine. We do not find, however, sufficient evidence to support Schreiber's convictions for wire fraud under counts three and four.

A wire fraud conviction requires proof of (1) a scheme to defraud, and (2) the use of interstate wire communications in furtherance of the scheme. 18 U.S.C. § 1343; *United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1275 (1997); *United States v. Loney*, 959 F.2d 1332, 1337 (5th Cir. 1992). Under the wire fraud statute, 18 U.S.C. § 1343, "once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *United States v. Faulkner*, 17 F.3d 745, 771-72 (5th Cir.) (quotations and citations omitted), *cert. denied*, 513 U.S. 870

9

(1994). But the communication at issue must satisfy the interstate nexus set forth in § 1343; it is an immutable requirement. *See United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (noting that the interstate nexus requirement of wire fraud is not a substantive element, but arises from constitutional limitations on congressional power over intrastate activities), *cert. denied*, 514 U.S. 1097 (1995).

In this case, there is sufficient evidence supporting Schreiber's conviction for conspiracy under count one. Thus, there is sufficient evidence of a scheme to defraud, the first element of the wire fraud offense. *Gray*, 96 F.3d at 773. Schreiber, however, assails his wire fraud conviction under counts three and four by attacking the second element of the offense. He alleges that there is no evidence in the record that the telephone calls at issue in those counts crossed state lines. We agree.

Count three was based on a telephone conversation that occurred between Schreiber and JoAnn Copeland on October 10, 1990. Copeland testified at trial that during that conversation she and Schreiber discussed payment problems that were occurring with several of Marhil's customers. In her testimony, however, Copeland could not remember where Schreiber was located when this telephone call took place. Moreover, there is no evidence in the record, documentary or otherwise, showing that the October 10 telephone call crossed state lines.

10

Count four was based on a telephone call between Schreiber and Wallace on January 7, 1991. Wallace testified at trial that on that day he placed a call to Schreiber in Aspen, Colorado, and left a message because he was unable to reach him in person. Schreiber subsequently returned Wallace's call, and proceeded to allay Wallace's concerns about the blank check he had provided Schreiber. On cross-examination, Wallace conceded that he did not know where Schreiber was when he returned the call. Again, as with the telephone call in count three, there is no evidence in the record which would indicate that Schreiber was outside the State of Texas when the conversation took place.

Viewing the record in a light most favorable to the government, we conclude that there is insufficient evidence of an interstate nexus with respect to the telephone calls that form the basis of counts three and four. We thus reverse Schreiber's wire fraud convictions under those counts. For the same reasons, we reverse Izydore's convictions for wire fraud under counts three and four, which were based upon the same telephone calls.

In a related argument Schreiber argues that, because his wire fraud convictions in counts three and four are invalid, his conspiracy conviction in count one is likewise deficient because one of its two objects was the substantive offense of wire fraud. He asserts that because the general verdict on the conspiracy charge does not indicate which object the jury relied on in reaching that verdict, it is impossible to determine whether the

11

conspiracy conviction rests on the wire fraud object.  We reject this argument.

Schreiber was convicted on five separate counts of wire fraud and three separate counts of bankruptcy fraud.  We have reversed only two of the wire fraud convictions.  Accordingly, Schreiber's argument is flawed in two respects.  First, there are three remaining wire fraud convictions that support the wire fraud object in the conspiracy count.  Second, the Supreme Court has held that the failure of proof on one of several alternative conspiratorial objects does not void the conspiracy conviction if there is sufficient proof as to any one of the objects of the conspiracy. *Griffin v. United States*, 502 U.S. 46, 56-57 (1991).  We thus affirm Schreiber's conspiracy conviction in count one.

## IV.  IZYDORE'S CLAIM OF DENIAL OF COUNSEL

Izydore contends that he was denied his right to counsel of choice when the district court refused to allow David L. Botsford ("Botsford") to represent him at trial.  Izydore maintains that the district court then repeated that mistake by refusing to allow Botsford to represent him on appeal.  We do not find Izydore's arguments persuasive.

Under the Sixth Amendment a defendant is guaranteed assistance of counsel in all criminal prosecutions.  *United States v. Morrison*, 449 U.S. 361, 364 (1981); *United States v. Hughey*, 147 F.3d 423, 428 (5th Cir. 1998).  Concomitant with that guarantee is

12

a defendant's right to hire the attorney of his choice. ***Morris v. Slappy***, 461 U.S. 1 (1983). But the right to counsel of choice is not an unfettered privilege. *See* ***Wheat v. United States***, 486 U.S. 153, 159 (1988) ("The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects."). It is well recognized that there is a presumption in favor of a defendant's counsel of choice, but that presumption may be overcome by, *inter alia*, an actual conflict of interest on the part of the chosen attorney, or by a showing of a serious potential for such a conflict. ***Id***. at 164. As observed by the Supreme Court in ***Wheat***, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." ***Id.*** at 159. To that end, a district court is afforded broad latitude in deciding whether countervailing considerations require the rejection of a defendant's preferred counsel. ***Id.*** at 163-64 ("The evaluation of the facts and circumstances of each case . . . must be left primarily to the informed judgment of the trial court.").

In this case, Schreiber was originally represented by two attorneys, Botsford and Richard Lubin ("Lubin"). Izydore was initially represented by only one attorney, Steven Brittain ("Brittain"). Roughly three weeks before the start of trial

13

Izydore moved the court to allow Botsford to appear as co-counsel with Brittain. At a hearing on the motion Izydore informed the court that Botsford was needed to assist in preparing the case for trial. He also maintained that Botsford would undertake various responsibilities at trial, including cross-examination. The court was advised that if Izydore's motion was granted, Botsford would withdraw from his representation of Schreiber with Schreiber's express permission.

In compliance with the dictates of the Sixth Amendment, the district court proceeded to explore the nature of Botsford's representation of Schreiber. The trial court also questioned counsel for all parties about whether there was a potential conflict of interest that might unexpectedly ripen into an actual conflict at trial. After conducting that inquiry, the district court concluded that Botsford's subsequent representation of Izydore would create a potential conflict of interest. The court then denied Izydore's motion, and later denied Izydore's motion to have Botsford represent him on appeal.

Izydore now challenges those rulings. He asserts that Botsford played only a limited role in the representation of Schreiber. Izydore also emphasizes that he and Schreiber proceeded to trial under a joint defense agreement, and that Schreiber explicitly waived any conflict of interest. In Izydore's opinion, the district court's ruling violated *Wheat* because mere speculation

14

about a conflict of interest is not enough to deny a defendant's counsel of choice; there must be a *serious* potential for conflict of interest.  We are not persuaded by Izydore's arguments.

Izydore forgets that at the hearing the government contradicted his claim that Botsford had played a minor role in Schreiber's representation.  The government, for example, informed the court that Botsford was involved in lengthy plea negotiations with the government on Schreiber's behalf.  Additionally, the government warned the court that, based on statements Izydore made in those plea negotiations, and in interviews with government agents, there were two potential conflicts of interest which could result in antagonistic defenses at trial.

On these facts we cannot conclude that the district court abused its discretion by refusing to allow Botsford to act as co-counsel for Izydore.  That Izydore may have waived any potential conflict of interest does not change our view.  Under **Wheat** it is clear that a defendant's waiver does not necessarily preclude a district court from rejecting a defendant's counsel of choice when the overall circumstances of a case suggest a conflict of interest may develop.  **Id.** at 163.  In this case, Schreiber's purported waiver was significantly outweighed by other facts that strongly counseled against allowing Botsford to act as co-counsel for Izydore.

We could not accept Izydore's argument without turning a blind

15

eye to the original design of the Sixth Amendment. The basic purpose of the right to counsel "is simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). When considering Sixth Amendment claims "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984). In the present action, Izydore was represented by Brittain before, during, and after trial. There is no indication in the record that Brittain's representation was inadequate or in any way unsatisfactory to Izydore. Given the fact that Izydore was represented by one attorney of his own choosing, we are hard pressed to find a denial of his right to counsel based solely on the fact that he was denied a second attorney of his choice. We find no error in the district court's decision.

## V. SENTENCING CLAIMS

The appellants allege that the district court improperly calculated their sentences under the United States Sentencing Guidelines by (1) calculating the amount of loss to be $976,158, under U.S.S.G. § 2F1.1(b)(1); (2) finding that the appellants were organizers or leaders of a criminal activity involving five or more participants, or was otherwise extensive, under U.S.S.G. § 3B1.1(a); and (3) finding that the appellants violated a judicial

16

order, under U.S.S.G. § 2F1.1(b)(3). We review each challenge in turn.[2]

The appellants first contend that the district court erred in calculating the amount of loss to be attributed to them under U.S.S.G. § 2F1.1(b)(1). The district court's findings in this regard are reviewed for clear error. *United States v. Wimbish*, 980 F.2d 312, 313 (5th Cir. 1992). At sentencing the district court determined that the appellants were responsible for a total loss of $976,158.[3] The district court based its determination on the findings in the appellants' presentence reports, although the court did hear testimony from an expert witness who testified on the appellants' behalf. The presentence reports arrived at a total of $976,158 by adding the following three figures: (1) $656,000, which was described in the presentence reports as the value of Marhil at the time of the bankruptcy court's order of confirmation; (2) $110,000, which was listed in the presentence reports as the total loss to post-petition creditors for supplies received but not paid for; and (3) $210,158, which was characterized in presentence reports as the expenses associated with the appointment of the

---

[2] Schreiber, but not Izydore, argues that the district court erred by increasing his offense level by two levels for obstruction of justice under U.S.S.G. § 3C1.1. We have reviewed the record and find no merit to this argument.

[3] We note, however, that in the subsequent judgment of conviction the district court assessed a joint and several obligation against each defendant for restitution in the amount of $564,412.09. We would ordinarily expect that the restitution obligation and the amount of loss would be nearly the same.

17

bankruptcy trustee, attorney, and auditor, needed to investigate Marhil's reorganization plan (collectively "trustee's fees"). On appeal, the appellants challenge the accuracy of these three determinations.

The applicable Sentencing Guidelines provision for offenses involving fraud is U.S.S.G. § 2F1.1. Section 2F1.1 assigns a base offense level of six, and then adds incremental levels according to the amount of loss resulting from the fraud. U.S.S.G. § 2F1.1. A "loss" under § 2F1.1 means the actual or intended loss to the victim, whichever is greater. U.S.S.G. § 2F1.1 commentary n.7. Further, the amount of loss need not be determined with precision. The district court need only make a reasonable estimate given the available information. U.S.S.G. § 2F1.1 commentary n.8.

Here, the appellants first contend that the district court erred by including in its calculations the $656,000 that represented the value of Marhil at the time the bankruptcy court entered its order of confirmation. The appellants maintain that this figure is flawed because it is based only on Marhil's assets at the time of the confirmation order, and does not reflect the company's liabilities.

The defendants' presentence reports state that the value of Marhil was $656,000 when the plan of reorganization was finally confirmed. The presentence reports do not calculate that figure independently, but claim that this amount is "established in the August 29, 1990, Order Confirming Marhil Manufacturing, Inc.'s Plan

18

of Reorganization." That statement is incorrect. We have reviewed the bankruptcy court's August 29 Order and find no reference at all to the value of Marhil. Nevertheless, given the record as a whole we cannot conclude that this single misstatement brings the district court's ruling into the realm of clear error.

The evidence at trial established that the defendants were willing to expend $656,000 in total capital in order to gain control of Marhil. That figure consisted of $225,000 in cash, a $250,000 line of credit for Marhil's use, a $145,000 purchase of equipment, and $36,000 in leasing costs for commercial real estate. Although $656,000 may not be a precise valuation of Marhil's worth under the appellants' proposed accounting, we find that it was a reasonable estimate of its value given the available information.[4] *See* U.S.S.G. § 2F1.1 commentary n.8. (amount of loss need not be determined with precision, but must only be a reasonable estimate given the available information). Accordingly, we conclude that the district court's decision to include that figure in its loss calculations was not clear error.

Next, the appellants contend that the district court committed

---

[4] We also note that, although the actual presentence reports do not contain this breakdown, it is clearly set forth in an addendum to Izydore's presentence report that summarizes and considers Izydore's sentencing objections. *See **United States v. Sanders***, 942 F.2d 894, 898 (5th Cir. 1991) ("[A] presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial judge in making the factual determinations required by the sentencing guidelines").

19

clear error by deciding to include in its loss calculations the $110,000 debt owed to post-petition creditors. They insist that this debt cannot be considered a loss because it generated $510,170 in receivables for Marhil. We find no clear error on this point.

Finally, the appellants assail the district court's decision to include in its loss calculations the $210,158 in trustee's fees. The appellants maintain that those expenses are consequential losses that cannot be considered in loss calculations under U.S.S.G. § 2F1.1. We note as a threshold matter that there is no dispute as to the amount of the trustee's fees. The only question is whether those fees are to be considered a "loss" under U.S.S.G. § 2F1.1. That is a legal question involving the correct interpretation of the Sentencing Guidelines that we review *de novo*. *See **United States v. Randall***, 157 F.3d 328, 330 (5th Cir. 1998) (district court's interpretation and application of U.S.S.G. § 2F1.1 is reviewed *de novo*); *see also **United States v. Vitek Supply Corp.***, 144 F.3d 476, 488 (7th Cir. 1998) (observing that meaning of "loss" under U.S.S.G. § 2F1.1. is a question of law reviewed *de novo*).

The commentary to U.S.S.G. § 2F1.1 describes "loss" as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1 (also incorporating by reference the discussion of loss valuation contained in commentary of U.S.S.G. § 2B1.1); *see also* § 2B1.1 ("'Loss' means the value of the property taken,

20

damaged, or destroyed"). Thus, on its face the definition of loss is centered on the value of the thing taken, without reference to consequential or incidental losses.

Other provisions in the Sentencing Guidelines plainly indicate that consequential losses are ordinarily not taken into account under U.S.S.G. § 2F1.1. The Sentencing Guidelines provide, for instance, that loss "does not include interest the victim could have earned . . . had the offense not occurred." U.S.S.G. § 2F1.1 commentary n.7. Similarly, the Sentencing Guidelines explain that "when property is taken or destroyed, the loss is the fair market value of the particular property at issue." U.S.S.G. § 2F1.1 commentary n.2. Thus, it stands to reason that if a defendant steals an automobile the applicable loss would be the fair market value of the car. It would not include the victim's consequential losses, like paying for public transportation or missing work, even though such losses were the direct result of the defendant's unlawful conduct, and would not have occurred but for the defendant's actions.

This is not to say that consequential losses are never considered under U.S.S.G. § 2F1.1, for there are specific instances when consequential losses may properly be considered. The commentary to U.S.S.G. § 2F1.1 provides that "[i]n contrast to other types of cases, loss in a procurement fraud or product substitution case includes not only direct damages, but also consequential damages that were reasonably foreseeable." U.S.S.G.

21

§ 2F1.1 commentary n.7(c).  But the fact that the Sentencing Commission prescribed consequential losses in only these specific fraud cases, and not others, is strong evidence that consequential damages were omitted from the general loss definition by design rather than mistake.  Accordingly, we have found, as other courts have, that consequential losses typically are not counted when computing loss under U.S.S.G. § 2F1.1.  *United States v. Thomas*, 973 F.2d 1152, 1159 (5th Cir. 1992); *see also **United States v. Daddona**, 34 F.3d 163, 171-72 (3d Cir.), *cert. denied*, 513 U.S. 1002 (1994); **United States v. Marlatt**, 24 F.3d 1005, 1007-08 (7th Cir. 1994); **United States v. Newman**, 6 F.3d 623, 630 (9th Cir. 1993) (applying U.S.S.G. § 2B1.1).

Here, the government contends that the trustee's fees are not consequential losses because the fees were the direct result of the appellants' conduct.  The government's analysis misses the mark.  The touchstone for determining loss under U.S.S.G. § 2F1.1 is the "value of the thing taken."  That concept is the key measure because the Sentencing Commission believed that punishment for fraud should reflect a balance between the loss to the victim and the gain to the defendant.  *See* U.S.S.G. § 2B1.1 commentary background ("The value of property stolen plays an important role in determining sentences for theft and other offenses involving stolen property because it is an indicator of both the harm to the victim and the gain to the defendant").  It was a "compromise

22

between the retributive goals of punishment, which might have been advanced best by basing sentence solely on the injury to the victim, and its deterrent function, which might have been advanced best by determining sentence solely from the offender's gain." *United States v. Wilson*, 993 F.2d 214, 217 (11th Cir. 1993).

In this case, over the course of the appellants' unlawful conduct Marhil was robbed of its capital, and post-petition creditors were defrauded. There can be no doubt that this money was "taken" by the appellants, as that word is commonly understood. The trustee's fees, on the other hand, were incurred after the appellants' unlawful conduct had ended. And while it is true that the trustee's fees were a consequence of the appellants' unlawful conduct, mere "but for" causation is not the litmus test for loss determinations under U.S.S.G. 2F1.1. *See **Marlatt***, 24 F.3d at 1007 (expressly recognizing this point). The appropriate measure is the value of the thing taken, and under that standard we cannot reasonably conclude that trustee's fees were the "thing taken" from Marhil. Accordingly, we find that the district court erred in including the trustee's fees in its loss calculations.

We turn next to the appellants' challenge to the district court's finding that the appellants were organizers or leaders of a criminal activity involving five or more participants, or that was otherwise extensive, under U.S.S.G. § 3B1.1(a). Section 3B1.1(a) has two requirements: (1) the defendant must have been a

leader or organizer in the criminal activity, and (2) the scheme must have either included five or more participants or been otherwise extensive. U.S.S.G. § 3B1.1(a). The commentary defines "participant" as a person who is criminally responsible for the commission of the offense, but need not have been convicted. U.S.S.G. § 3B1.1(a) commentary n.1. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1(a) commentary n.3. Moreover, the use of "unknowing services" of outsiders may make the criminal activity "otherwise extensive." U.S.S.G. § 3B1.1(a) commentary n.3. We review the district court's findings in this regard for clear error. *United States v. Narvaez*, 38 F.3d 162, 166 (5th Cir. 1994), *cert. denied*, 514 U.S. 1087 (1995).

On appeal the appellants focus their challenge on the adequacy of proof supporting the requisite number of participants, and the alternative requirement that the scheme be otherwise extensive. At sentencing the district court made an express finding that the scheme involved five or more participants, and that it was otherwise extensive. Those findings are not clearly erroneous.

Finally, the appellants contend that the district court erred by enhancing their offense levels under U.S.S.G. § 2F1.1(b)(3), which provides for a two-level increase if the underlying offense involves a "violation of any judicial or administrative order,

24

injunction, decree, or process." U.S.S.G. § 2F1.1(b)(3). We review *de novo* the district court's ruling on this issue. **United States v. Saacks***, 131 F.3d 540, 543 (5th Cir. 1997). The appellants contend that error attended this decision because their actions did not violate any specific order of the district court. The appellants' contention is foreclosed by our decision in **Saacks**. In that case we expressly held that bankruptcy fraud is in itself a violation of a judicial or administrative order or process within the meaning of U.S.S.G. § 2F1.1(b)(3). **Id.** at 546. Accordingly, the district court did not err in this regard.

## VI. CONCLUSION

Based on the foregoing, we VACATE the appellants' convictions for wire fraud under counts three and four, but AFFIRM the appellants' remaining convictions. We also VACATE the appellants' sentences and REMAND to the district court for resentencing consistent with this opinion.