# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-10746

United States Court of Appeals
Fifth Circuit

**FILED**
August 20, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARTAVIOUS DETREL BANKS KEYS, also known as Cheese, also known as Matt,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CR-244-1

Before CLEMENT, HIGGINSON, and HO, Circuit Judges.[*]

PER CURIAM:[**]

Martavious Detrel Banks Keys was convicted by a jury of two counts of sex trafficking of a child and one count of sex trafficking through force, fraud, or coercion in violation of 18 U.S.C. § 1591. Keys appeals, contending that Count One and Count Three of the indictment were multiplicitous and that the

---

[*] Judge Ho concurs in the judgment only.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-10746

district court erred in admitting the testimony of two law enforcement officers. For the reasons stated below, we AFFIRM.

**I**

On March 13, 2015, Jane Doe 1 and Jane Doe 2 left the Nexus Recovery Center, a substance abuse treatment facility in Dallas, Texas. The girls were 15 years old and 14 years old, respectively. At a gas station they reached on foot, Jane Does 1 and 2 met an adult male they identified as "Black," who offered to take them back to his apartment and provide them with narcotics. Jane Doe 1 told Black that the girls were both 15 years old. The girls stayed at Black's apartment for approximately three days. During that time, Black and another man provided Jane Does 1 and 2 with methamphetamine and crack cocaine, and the girls engaged in sex acts with the two men. While staying at Black's apartment, Jane Does 1 and 2 also met another friend of Black's, later identified as Keys or "Cheese." Black later drove the girls to an abandoned area and sold them to Keys.[1]

Keys took the girls back to his apartment, where he created a Backpage.com[2] ad inviting potential patrons to engage in commercial sex with an apparently fictional individual named "Kacy." Using a number of prepaid cell phones, Keys arranged for men to come to his apartment to engage in sex acts with the girls in exchange for money. When the men would arrive at Keys's apartment, Jane Doe 1 would greet them at the door and lead them to a bedroom where she would instruct them to choose between herself and Jane Doe 2. Both girls would be naked. After the men chose Jane Doe 1, Jane Doe 2,

---

[1] Jane Doe 1 told investigators that Keys purchased Jane Doe 1 for $240 and Jane Doe 2 for $47.

[2] Backpage.com "is Craigslist for the sex trade." In 2018, Backpage.com pleaded guilty to human trafficking in Texas. *See* https://www.texasattorneygeneral.gov/news/releases/backpage.com-pleads-guilty-to-human-trafficking-in-texas.

2

or both girls, Jane Doe 1 would collect the cash and pass it under the bathroom door to Keys, who would be waiting on the kitchen side. Jane Doe 2 estimates that she engaged in commercial sex acts roughly ten times total while at Keys's home. Jane Doe 1 testified that, on average, she engaged in commercial sex acts sixteen times per day. On at least one occasion, her vagina was so swollen and bleeding that Keys suggested she insert cosmetic sponges inside herself or, alternatively, have anal sex so that she could continue to entertain customers. Keys kept all of the money the girls earned.

At some point, Jane Doe 1 and Jane Doe 2 told Keys that they were only 15 and 14 years old. He continued to have the girls engage in commercial sex acts with men. Keys also raped Jane Doe 1 on multiple occasions and Jane Doe 2 at least once. While both girls were still at his home, Keys left for several days, apparently to pick up a Chevrolet Tahoe he was able to purchase with the money earned by the girls. His friends monitored the girls while he was gone. Keys and his friends provided Jane Does 1 and 2 with a constant supply of crack cocaine. Though Jane Doe 2 initially wanted to use drugs, she eventually became uncomfortable and wanted to stop and "get out of there." Keys and Jane Doe 1 pressed her to continue using, and Keys became violent. Jane Doe 2 testified that when she told Keys she no longer wanted to engage in commercial sex acts, Keys choked her, slammed her against the wall and said: "If you don't do what you're supposed to do, we're going to have a problem."

Jane Doe 2 was able to leave Keys's apartment approximately two weeks after he purchased her from Black. After Keys threatened her, Jane Doe 2 asked the next customer who came to the apartment if he would help her get out. The customer apparently paid Keys to let him leave with Jane Doe 2. Jane Doe 1 remained with Keys for roughly two weeks after Jane Doe 2 left, during which time Keys began shuttling her between various motels. She continued

to engage in sex acts with various customers and Keys collected the money. But the character of the relationship between Keys and Jane Doe 1 shifted. Keys became more violent and controlling. Keys regularly abused Jane Doe 1 and pointed a gun at her; she testified that she did not feel free to leave. Jane Doe began to fear for her life. She believed, however, that if she ran away, Keys would come after her. At one point, Keys posted an ad offering commercial sex to customers in Houston on Backpage.com and drove Jane Doe 1 there in his Tahoe. The trip was cut short when Keys got into a physical altercation with a friend and beat him severely.

Though Jane Doe 1 was afraid Keys would find her if she attempted to leave him, an older prostitute ultimately convinced her that leaving Keys was the safest choice. The woman took Jane Doe 1 to another apartment. Keys showed up less than a day later with three friends and a gun, which he pointed in Jane Doe 1's face. A man staying at the apartment with Jane Doe 1 and the older prostitute came out with a large gun and forced the men to leave without Jane Doe 1. For the next week, she could not leave the house alone because Keys had friends patrolling the street. Jane Doe 1 was recovered by the police roughly one week later, on May 4, 2015. She was severely sleep-deprived, malnourished, and suffering from sexually transmitted diseases.

On May 5, officers executed a search warrant of Keys's residence. Among other items, officers retrieved a semiautomatic pistol, sex toys, a laptop, and multiple cell phones. The officers interviewed Jane Does 1 and 2 extensively, and they were able to locate several Backpage.com ads posted by Keys that fit the description provided by Jane Doe 1. Records subpoenaed by law enforcement from motels identified by Jane Doe 1 confirmed that Keys had paid for several rooms during the relevant time frame. In May 2015, Detective Kevin Halbert called Keys for an interview, and Keys initially agreed to meet. Keys did not show up for the meeting, and law enforcement spent the next year

attempting to locate him. Halbert interviewed Keys in person for the first time in May 2016. Keys admitted to Halbert that he knew the girls, that they had stayed with him for a period of time, that they engaged in prostitution, and that he discovered at some point that they were underage. He claimed that when he found out Jane Does 1 and 2 were only 15 and 14 years old, he had them leave his apartment. Keys also admitted that he had set up the Backpage.com ads. Keys maintained, however, that he was a passive observer and was simply "trying to take care of [the girls]"—he denied that he facilitated their engagement in commercial sex. At first, Keys denied taking any money from the girls; eventually, he admitted that he accepted money from them, though he claimed it was only so that he could feed and house them.

Keys was ultimately indicted on three counts of sex trafficking. Count One charged Keys with sex trafficking of children under 18 U.S.C. § 1591(a) and (b)(2) for causing Jane Doe 1, who was under 18 years of age, to engage in commercial sex acts. Count Two charged Keys with sex trafficking of children under § 1591(a) and (b)(2) for causing Jane Doe 2, also a minor, to engage in commercial sex acts. Count Three charged Keys with sex trafficking Jane Doe 1 through force, fraud, or coercion under § 1591(a)(1) and (b)(1)–(2).

Prior to trial, the defense filed a motion to dismiss Count One to avoid multiplicity, arguing that Counts One and Three punish the same criminal offense in violation of the Double Jeopardy Clause. The district court carried the motion with the case, and ultimately submitted all three counts to the jury. Several law enforcement witnesses testified, including Halbert and Special Agent Phillip Campbell, who explained how the hotel, cell phone, Backpage.com ads, and social media records obtained during the investigation corroborated the girls' account of their experience. Both law enforcement officers testified that they believed Keys had a reasonable opportunity to

observe the girls and that he caused or compelled them to engage in commercial sex acts. The defense did not object to the testimony at trial.

Keys was found guilty of all three sex trafficking counts. The district court sentenced Keys according to the applicable guideline range to life in prison and imposed a mandatory special assessment of $300.00. Keys did not reassert his multiplicity objection at sentencing, though the defense did object that Presentence Report applied numerous, overlapping enhancements and resulted in Keys being "punished over and over again for the same conduct and the same idea." Keys appeals and presents two issues for review: 1) whether the district court erred in denying Keys's motion to dismiss Count One for multiplicity; and 2) whether the district court plainly erred in allowing Halbert and Campbell's testimony at trial. Specifically, Keys contends that Halbert and Campbell improperly opined that Keys was guilty of the offenses charged and that he was lying during his interview when he denied direct involvement in the crime.

## II

This court reviews issues of multiplicity de novo. *United States v. Dupre*, 117 F.3d 810, 818 (5th Cir. 1997).

Because Keys did not object to the officers' testimony at trial, this court reviews the district court's admission of that testimony only for plain error. *United States v. Garcia-Flores*, 246 F.3d 451, 457 (5th Cir. 2001). Under plain error review, the court may remedy the alleged error only if: (1) there is an error or defect; (2) the error is clear or obvious; and (3) the error affected the appellant's substantial rights. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). "An error is plain if it is at least clear under current law." *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010) (internal quotations omitted). The error must be "so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's

timely assistance in detecting it." *United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010) (internal quotations omitted). For the error to have affected the appellant's substantial rights, "the error must have been prejudicial," meaning that "[i]t must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). To demonstrate prejudice, "a defendant must show a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Holmes*, 406 F.3d 337, 365 (5th Cir. 2005) (alteration in original) (internal quotations omitted). In regards to potentially improper witness testimony, this court has stated: "[E]ven if we were to find the existence of plain error, we could find it harmless if there is sufficient evidence, aside from any potentially impermissible testimony, from which the jury could find the Defendant[] guilty." *United States v. Espino-Rangel*, 500 F.3d 398, 400 (5th Cir. 2007). "[I]f the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Puckett*, 556 U.S. at 135 (alteration in original) (internal quotations omitted).

### III

Keys first contends that Count One and Count Three of the indictment are multiplicitous because they charge him twice for trafficking the same person—Jane Doe 1.

The relevant criminal statute reads:

(a) Whoever knowingly–

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

No. 17-10746

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Subsection (b) prescribes different mandatory minimum sentences for sex trafficking of a child between the ages of fourteen and eighteen, sex trafficking of a child under age 14, or sex trafficking by force:

> (b) The punishment for an offense under subsection (a) is–
>> (1) if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or
>>
>> (2) if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

18 U.S.C. § 1591(b). Subsection (c) provides that in a prosecution for trafficking any individual under eighteen, if "the defendant had a reasonable opportunity to observe" the victim, "the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years." 18 U.S.C. § 1591(c).

No. 17-10746

The government charged Keys with two separate counts of sex trafficking Jane Doe 1 under the statute: Count One) a violation of 18 U.S.C. § 1591(a)(1) and (b)(2) by causing Jane Doe 1, who was under 18 years of age, to engage in commercial sex acts; and Count Three) a violation § 1591(a)(1) and (b)(1) for sex trafficking Jane Doe 1 through force, fraud, or coercion. The government maintains that Subsections (b)(1) and (b)(2) enumerate two separate crimes which contain different elements, proof requirements for intent, and penalties. Further, the government argues that, even if (b)(1) and (b)(2) are not separate crimes, Keys committed two distinct prohibited acts during the relevant time period. Keys contends that Subsection (a)(1) enumerates only one crime that can be committed in one of two ways: causing an individual to engage in a commercial sex act through force, fraud, or coercion *or* causing an individual under eighteen years of age to engage in a commercial sex act. He asserts that because Count One and Count Three are predicated on a single, continuous course of criminal conduct involving the same victim, the government cannot charge both simultaneously.

Indictments are multiplicitous if they charge a single offense in two or more separate counts. *United States v. Ogba*, 526 F.3d 214, 232–33 (5th Cir. 2008). Such indictments implicate, for obvious reasons, Double Jeopardy concerns. *United States v. Sanjar*, 876 F.3d 725, 737 (5th Cir. 2017), *cert. denied sub nom. Main v. United States*, No. 17-8107, 2018 WL 1317751 (U.S. Apr. 16, 2018). They punish the defendant twice for the same conduct "where Congress has not authorized cumulative punishment." *See Ogba*, 526 F.3d at 232–33. "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *United States v. Swaim*, 757 F.2d 1530, 1537 (5th Cir. 1985). At bottom, the multiplicity inquiry is a question of statutory construction—

9

whether Congress intended to permit cumulative punishment for one instance or pattern of conduct. *See Ogba*, 526 F.3d at 232–33.

This court applies the test laid out in *Blockburger v. United States*, 284 U.S. 299 (1932) to discern whether Congress has prescribed multiple punishments for the same conduct. *See Ogba*, 526 F.3d at 233; *See United States v. Davis*, 656 F.2d 153, 156 n.1 (1981) (citing *United States v. Goodman*, 605 F.2d 870 (5th Cir. 1979)); *Normandale v. United States*, 201 F.2d 463 (5th Cir.), *cert. denied* 345 U.S. 999 (1953)). "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *United States v. Nguyen*, 28 F.3d 477, 485 (5th Cir. 1994) (citing *Albernaz v. United States*, 450 U.S. 333, 336–38 (1981); *see also Blockburger*, 284 U.S. at 304; *Davis*, 656 F.2d at 156 n.1 (noting that *Blockburger* "applie[s] to several offenses enumerated in one statutory section as well as to offenses named in separate sections")). As long as each statutory provision requires proof of a fact the other does not, "the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Nguyen*, 28 F.3d at 485 (quoting *Brown v. Ohio*, 432 U.S. 161, 166 (1977)).

Keys's indictment passes muster under *Blockburger*. Count One and Count Three charge Keys under two separate subsections of 18 U.S.C. § 1591—subsections (b)(1) and (b)(2). Each subsection requires proof of a fact that the other subsection does not. Subsection (b)(1) requires the government to prove that the defendant knew or recklessly disregarded the fact that the offense would be effected by means of force, fraud, or coercion. *See* 18 U.S.C. 1591(b)(1). Trafficking by force can be charged irrespective of the victim's age. Subsection (b)(2) requires that the government prove that the defendant knew or

No. 17-10746

recklessly disregarded the fact that the victim was under 18 years old. 18 U.S.C. § 1591(b)(2). Moreover, under subsection (b)(2), the government can satisfy the intent requirement by demonstrating that the defendant had a reasonable opportunity to observe the victim—it need not demonstrate that the defendant actually knew or recklessly disregarded her age. *See* 18 U.S.C. § 1591(c). In other words, subsection (c) imposes strict liability on defendants regarding a victim's age. *United States v. Copeland*, 820 F.3d 809, 813 (5th Cir. 2016). Subsection (c) does not so alter the intent requirement for force under subsection (b)(1). *See* 18 U.S.C. § 1591(c).[3] In sum, the subsections require the government to prove different elements, each of which requires different evidence. Despite the fact that Keys engaged in a single, continuous course of unbroken criminal conduct, he can properly be charged separately with violating both statutory subsections.

When assessing two subsections within a single statutory scheme, however, courts are generally more reluctant to rely on *Blockburger* alone to allow punishment under both provisions. *See United States v. McLaughlin*, 164 F.3d 1, 15 (D.C. Cir. 1998); *cf. United States v. Munoz-Romo*, 989 F.2d 757, 759 (5th Cir. 1993). Accordingly, it is often helpful to examine other indicia of congressional intent. For example, the fact that Congress has prescribed different penalties for violations of subsections (b)(1) and (b)(2)—a minimum of 10 years' imprisonment for a violation of subsection (b)(2) and a minimum of 15 years for a violation of subsection (b)(1)—is a strong indication that it intended to allow for multiple punishments. *See, e.g., United States v. Winchester*, 916 F.2d 601, 605–08 (11th Cir. 1990) (holding multiple convictions under § 922(g) multiplicitous because, among other things, the

---

[3] Subsection (c) would apply to a charge under subsection (b)(1) for trafficking a victim under the age of 14. *See* 18 U.S.C. § 1591(c); *Copeland*, 820 F.3d at 813.

11

statute "did not list separate penalties for the separate subdivisions of subsection (g)").

Moreover, the legislative history indicates that Congress sought to punish trafficking aggressively. It has amended Section 1591 several times to allow more extensive prosecution of exploitative crimes. *See* Pub. L. No. 110-457, 122 Stat. 5044 (2008); Pub. L. No. 114-22, 129 Stat. 247 (2015). The legislative record accompanying the Trafficking Victims Protection Act of 2000, which encompasses Section 1591, states that human trafficking is a "degrading institution of slavery" and "an evil requiring concerted and vigorous action." Pub. L. No. 106-386, 114 Stat. 1464, Sec. 102(b)(1), 21 (2000). In short, the history of the statute supports construing subsections (b)(1) and (b)(2) as distinct crimes that can be charged separately.

Counts One and Three of Keys's indictment are not multiplicitous. Accordingly, we AFFIRM Keys's convictions on all three Counts.[4]

**IV**

We now turn to Keys's challenge to the admissibility of law enforcement testimony. Keys alleges two overarching problems with Halbert and Campbell's testimony. First, Keys contends that both officers improperly opined that Keys was guilty of the offenses charged. Second, Keys claims that Halbert was erroneously allowed to offer his opinion that Keys was not telling the truth during his police interview.

Both Halbert and Campbell testified as lay witnesses—neither was qualified as an expert. Accordingly, Federal Rules of Evidence 701 and 704(a)

---

[4] We note that each individual violation of Section 1591 charged in the indictment allows for a life sentence. *See* 18 U.S.C.§ 1591(b)(1), (2). At sentencing, the district court stated: "I'm going to sentence at the Guideline range and sentence the Defendant to life in prison. That sentence is on *each* of Counts 1, 2, and 3 to run concurrently." This language indicates that the district court would have sentenced Keys to life in prison on any one of the charges. All of the conduct would still be relevant to the Guidelines computation in the PSR.

govern the propriety of their opinion testimony. FED R. EVID. 701, 704(a). Rule 701 provides that non-expert opinion testimony must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED R. EVID. 701. Rule 704 clarifies that "[a]n opinion is not objectionable just because it embraces an ultimate issue." FED R. EVID. 704(a); *see also Espino-Rangel*, 500 F.3d at 400 (stating that while lay witnesses may not offer legal conclusions, "testimony in the form of an opinion or inference otherwise admissible is not objectionable simply because it embraces an ultimate fact issue to be determined by the factfinder").[5] Rule 704 was, however, intended to preserve the effect of other evidentiary provisions meant to "assur[e] against the admission of opinions which would merely tell the jury what result to reach." FED R. EVID. 704 advisory committee's note to 1972 proposed rules. Thus, under Rule 704(a), testimony that amounts to a legal conclusion is improper. *See United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003); *see also United States v. McGee*, 821 F.3d 644, 648–49 (5th Cir.), *cert denied*, 137 S.Ct. 251 (2016).[6] In evaluating challenged testimony, the court must

---

[5] Keys cites Rule 704(b) for the proposition that "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." "[B]ut neither [Halbert] nor [Campbell] was called as an expert witness, so FRE 704(b) has no application in the instant case." *Espino-Rangel*, 500 F.3d at 400. Moreover, "[l]ay witnesses [] may give opinion testimony about a defendant's mental state." *United States v. Diaz*, 637 F.3d 592, 599 (5th Cir. 2011); *see also United States v. Heard*, 709 F.3d 413, 422 (5th Cir. 2013).

[6] Rule 704(a) is the source of the general limitation on opinion testimony on ultimate legal issues. *See, e.g.*, *McGee*, 821 F.3d at 649; *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). This limitation applies equally to both lay witness and expert witness testimony. *Compare Izydore*, 167 F.3d at 218 and *Williams*, 343 F.3d at 435 (discussing the limitation when evaluating lay witness testimony) *with United States v. Buchanan*, 70 F.3d 818, 833 n.20 (5th Cir. 1995) and *United*

distinguish "between an impermissible opinion on an ultimate legal issue and 'a mere explanation of the [witness's] analysis of facts which would tend to support a jury finding on the ultimate issue.'" *United States v. Buchanan*, 70 F.3d 818, 833 n.20 (5th Cir. 1995) (quoting *United States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994)).

Again, the defense did not object to the admission of the testimony at trial and therefore we review only for plain error. *Garcia-Flores*, 246 F.3d at 457.

1. *Opinion testimony relevant to Keys's ultimate guilt*

As this court has explained, "determinations of guilt or innocence are solely within the province of the trier of fact." *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999); *see also United States v. Buchanan*, 70 F.3d 818, 833 n.20 (5th Cir. 1995). Accordingly, a lay witness's opinion that a defendant is guilty of the crime charged would be improper trial testimony. *See id.*; *see also United States v. Thomas*, 847 F. 3d 193, 206 (5th Cir. 2017).

Relatedly, "questions which would merely allow the witness to tell the jury what result to reach are not permitted." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Of course, "separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile [task]." *Id.* The Advisory Committee Notes to the Federal Rules of Evidence offer the following example: While the question (1) "Did T have capacity to make a will?" would be improper, the question (2) "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of

---

*States v. Speer*, 30 F.3d 605, 610 (5th Cir. 1994) (discussing the limitation when evaluating expert witness testimony).

distribution?" would be allowed. FED R. EVID. 704 advisory committee's note to 1972 proposed rules.

Attempting to shed light on why the first formulation is problematic, this court explained that it "is phrased in such broad terms that it could as readily elicit a legal as well as a fact based response. A direct response, whether it be negative or affirmative, would supply the jury with no information other than the [witness's] view of how its verdict should read." *Owen*, 698 F.2d at 240. The second formulation is permissible because it is not explicitly framed as a request for an opinion "phrased in terms of inadequately explored legal criteria." FED R. EVID. 704 advisory committee's note to 1972 proposed rules. Rather, it breaks down the question of testamentary capacity—a question that has a specific legal meaning—into its discrete elements. *See* 1 McCormic On Evid. §12 (7th ed.). Stated differently, questions (1) and (2) capture the distinction "between an impermissible opinion on an ultimate legal issue and 'a mere explanation of the [witness's] analysis of facts which would tend to support a jury finding on the ultimate issue.'" *Buchanan*, 70 F.3d at 833 n.20 (quoting *Speer*, 30 F.3d at 610).

Halbert engaged in the following exchanges with the prosecutor at trial: 1) when asked, "[b]ased on all the information that you learned during your investigation, the entirety of it, did you believe that Jane Doe 1 had been compelled to engage in commercial sex acts through force, fraud, or coercion?" he responded, "[a]bsolutely"; 2) when asked "did you believe that the defendant, based on your investigation, had an opportunity to observe these girls?" he responded, "[a]bsolutely"; 3) when asked "did you believe, based on your investigation, that Jane Doe 2, being 14 at the time, was compelled to engage in commercial sex acts?" he responded, "[s]he was"; and 4) when asked "who do you believe compelled them to engage in those commercial sex acts?" he responded "[t]he defendant, Mr. Keys."

Similarly, Campbell had the following exchange with the prosecutor: 1) when asked, "[b]ased on your investigation in this case, do you believe that the defendant . . . caused Jane Doe 1 and Jane Doe 2 to engage in commercial sex acts in the Northern District of Texas?" he responded "I do"; 2) when asked "do you believe that the defendant either knew or had a reasonable opportunity to observe Jane Doe 1 and Jane Doe 2 during that time period?" he responded "I believe he did"; and 3) when asked "[d]o you believe that the defendant caused Jane Doe 1 to engage in commercial sex acts by force, fraud, or coercion?" he responded "[a]bsolutely."

The district court did not plainly err in admitting the above testimony. The formulations of the questions closely track the language of individual elements of the charged sex trafficking counts. *See* 18 U.S.C. § 1591(a), (c). For example, Counts One and Two required the government to prove that Keys: 1) knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means Jane Doe 1 and Jane Doe 2; 2) in or affecting state commerce; 3) that he did so knowing or in reckless disregard of the fact that Jane Doe 1 and 2 had not attained the age of 18 years *or* that he had a reasonable opportunity to observe them; and 4) that he did so knowing or in reckless disregard of the fact that they would be caused to engage in a commercial sex act. *See* 18 U.S.C. § 1591(a), (c). In isolating discrete elements of the crime of sex trafficking of a child, the questions conform to the formulation approved by the Advisory Committee Notes. *See* FED R. EVID. 704 advisory committee's note to 1972 proposed rules. The government did not ask Halbert or Campbell "do you believe that the defendant committed the offense of sex trafficking of a child?" Such a question is "phrased in terms of inadequately explored legal criteria." FED R. EVID. 704 advisory committee's note to 1972 proposed rules. Rather, the government asked Halbert and Campbell for their opinion regarding specific factual building blocks of the

ultimate crime. In that sense, the questions are eliciting "a mere explanation of the [witness's] analysis of facts which would tend to support a jury finding on the ultimate issue." *Speer*, 30 F.3d at 610.[7]

To the extent the district court erred in admitting the above testimony, such an error was not "so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *Trejo*, 610 F.3d at 319 (internal quotations omitted). While it is well-settled law in this circuit that lay witness opinions amounting to legal conclusions are inadmissible, the line between an impermissible legal conclusion and "explanation of a [witness's] analysis of facts" is somewhat blurry. The example provided by the Advisory Committee Notes to Rule 704 is helpful but not always conclusive. Moreover, the distinction is rarely dealt with in depth in the case law, as these types of challenges are often reviewed following a jury trial for plain error and can be disposed of on the third or fourth prong. *See, e.g.*, *McGee*, 821 F.3d at 649; *Izydore*, 167 F.3d at 218.

Furthermore, Keys has not shown a "reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *Holmes*, 406 F.3d at 365 (alteration in original) (internal quotations omitted). The volume and quality of the evidence against Keys is staggering. *See Espino-Rangel*, 500 F.3d at 400 (explaining that even if the admission of the testimony was plainly erroneous, the error is harmless if the remaining evidence at trial was sufficient to support the jury's verdict). Both victims testified at length about their experiences at trial, and the record indicates that their live testimony was consistent with their previous accounts. Their accounts were

---

[7] The testimony was also "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED R. EVID. 701. The defendant does not challenge the admissibility of the testimony under Rule 701.

No. 17-10746

corroborated by hotel, phone, and internet records. Keys admitted to a substantial amount of the conduct in his police interview. Given the evidence presented at trial, it is difficult to imagine Keys would have obtained a more favorable outcome absent the challenged testimony.

The district court did not err in admitting Halbert and Campbell's testimony. Even if the testimony was admitted in error, Keys has not met his burden to demonstrate that the error was obvious or that, absent the error, there is a reasonable probability the result of his trial would have been different.

2. *Opinion testimony pertaining to Keys's truthfulness*

Halbert's testimony regarding the veracity of Keys's statement to police is not an impermissible legal conclusion—it is an opinion of fact. It therefore does not run afoul of Rule 704(a)'s proscription of opinion testimony on an ultimate legal issue.[8] Accordingly, the source of the alleged problem with this subset of Halbert's testimony must be Rule 701. *See, e.g.*, *United States v. Churchwell*, 807 F.3d 107, 118–19 (5th Cir. 2015) (assessing non-expert testimony regarding the defendant's veracity under Rule 701). Keys incorrectly objects to the admission of Halbert's testimony on the basis of Rule 704(b). Accordingly, Keys has likely waived any Rule 701-specific challenges to the testimony for failure to adequately brief the issues. *See Williams v. Parker*, 843 F.3d 617, 622 n.14 (5th Cir. 2016). Regardless, Halbert's testimony meets the requirements of Rule 701, and it was therefore properly admitted.

Keys objects to Halberts' testimony that: 1) Keys minimized his role in facilitating the girls' prostitution; 2) Keys was not completely honest during

---

[8] To the extent Keys objects on the basis that Halbert's opining Keys lied during his interview is an indirect way of testifying to Keys's guilt or innocence, he identifies no authority that indicates this type of "veracity" testimony is improper because of some hypothetical, twice-removed, downstream effect on that ultimate legal conclusion.

his interview; 3) he believed Keys was lying when he said that he got rid of the girls after learning that they were underage; and 4) he believed Keys was lying when he stated that he made contact with Jane Doe 1 after she left him to tell her to stop engaging in the lifestyle and to warn the apartment's residents that she was underage. For these opinions to be admissible, they must be rationally related to Halbert's perception, helpful to understanding his testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. *See* FED R. EVID. 701. Again, an opinion is not objectionable merely because it encompasses an ultimate issue of fact for the jury's determination such as the veracity of a defendant's prior statements. *See* FED R. EVID. 704(a); *Churchwell*, 807 F.3d at 118.[9]

It was not error to admit Halbert's testimony. First, the testimony was certainly based on his personal perceptions. Halbert was one of the three agents present when law enforcement interviewed Keys. He participated actively in the questioning and he was able to observe, over some time, Keys's demeanor and the inconsistencies in his story. Moreover, Halbert's testimony was helpful. His opinion based on his observations gave context to Keys's statements and assisted the jury in understanding Halbert's interview tactics—which the defense sought to use against him on cross-examination. The defense also attempted to highlight the fact that Halbert had admitted Keys had told the truth about some things during his interview. To the extent that the defense wanted to capitalize on Halbert's admissions that Keys had been partially honest, Halbert's testimony that he did not think Keys was being truthful about a number of critical facts was undoubtedly beneficial to

---

[9] In the only case cited by Keys that speaks directly to testimony regarding the truthfulness of a defendant's statements, the First Circuit held that the district court abused its discretion in admitting the testimony because, in that particular circumstance, it was not *helpful*—not simply because it touched on an ultimate issue in the case. *See United States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011).

the jury. *See Churchwell*, 807 F.3d at 119 (stating that the challenged testimony was "appropriate, especially after the defense elicited testimony from [the witness] that [the defendant] was truthful at some point"). Lastly, it is clear that Halbert's opinion was not based on scientific, technical, or other specialized knowledge. Accordingly, the district court did not err in admitting Halbert and Campbell's testimony at trial. [10]

## V

For the foregoing reasons, we AFFIRM.

---

[10] Even if admitting the testimony was error, and even if that error was clear or obvious, Keys has failed to meet his burden to demonstrate that, absent the alleged error, the result of his trial would have been different for the same reasons as outlined in Section IV(1), *supra*.